The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oh, yay. Oh, yay. Oh, yay. All persons have any amount of form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit. I have managed to get their attention, so the court is now sitting. God save the United States and his Honorable Court. Good morning. Good morning. Mr. Tini, we're ready when you're ready. Good morning, Mr. Chief Judge Gregory, and may it please the court. My name is Derek Tini, and I'm here on behalf of the petitioners in these consolidated petitions for review. I'd like to reserve five minutes of my time for rebuttal. March 2021. That is the date by which MVP says it will have completed nearly all of the stream crossings at issue in these cases. It said this in a sworn declaration that it submitted to this court in opposition to the stay motion in the appeal of the biological opinion. That's case number 21-59. It is highly unlikely that these petitions will be briefed, scheduled for argument, argued, and decided before March 2021. As a result, the harm to petitioners, the environment, petitioners, members, is by definition irreparable. That is, absent a stay, there is no effective relief available. The trees along the stream banks would be cut down. Well, and they say for that same reason that their harm is irreparable because of the economic harm in not being able to complete the pipeline. The problem that MVP has in asserting that its excess costs are irreparable harm is that those harms are of its own cause. Stated otherwise, they're self-inflicted. This court told MVP two years ago that it was all likelihood going to need an individual permit. Nonetheless, it persisted with these invalid fixes that West Virginia and the court have tried, and it can't come to this court now and ask this court to consider that in the equitable balance. And the case that stands for that proposition is the DiBiase case, in which this court held that a party has to try to mitigate the harms that it's trying to assert in the equitable balance. And moreover, MVP- I have a question for you. Yes, Judge Wynn. Just in terms of organizing the way in which we look at this case. Yes. It seems to me you're bringing two primary, and I may be wrong, actions. One, you're challenging under the Endangered Species Act, and then secondly, you're challenging from the perspective of NWP 12. And so there's an initial question dealing with jurisdiction here. And so it seems to me, at least particularly with regard to the Endangered Species Act, that your jurisdiction argument's a little weak, given that that looks like it's something that should go to the district court. Well- How do you respond? Sure. Thank you, Judge Wynn. You know, the court has raised this jurisdictional argument, and frankly, I think it's disingenuous at best. Because to the Ninth Circuit just six weeks ago, in an appeal of a district court order, the court told that appellate court that a district court didn't have the authority to grant relief in a challenge to NWP 12. Yes, Judge Thack? Right, but the parties can't agree on jurisdiction or argue away jurisdiction. We either have it or we don't. Correct. So what direct review statute do you base jurisdiction on for your NWP 12 claim? Certainly. There's more than one way to skin this jurisdictional cat, Your Honor. The statute is 717RD. But the theories that we base our jurisdiction on are, number one, this is an as-applied challenge of a legislative rule. And number two, these are core actions all the way down, right? And the court's decision regarding NWP 12 and the Endangered Species Act, and the court's decision to modify Special Condition A, those are both inherent in the underlying decision. That's somewhat confusing to me. I'm trying to understand. First, again, on the Endangered Species Act, that's a different claim than the NWP 12. I just don't see it with the Endangered Species Act, but you're addressing now the NWP 12 one. And so how is it, what is, Judge Thack, what is the act that you maintain gives you the authority to proceed at this point? Your Honor, it is. I understand you've got all these challenges applied and all this other stuff, but what is the act that does this? The act is 717RD. That's the jurisdictional statute, and that gives this court the power to review the verifications. The verifications are an agency action in which the core is applying NWP 12. NWP 12, it has to be remembered that NWP 12 is a legislative rule. Right. So you're talking about the verifications. I guess I split it up in my mind separately, whether you have jurisdiction on your NWP 12 argument overall is one thing, and then whether you have jurisdiction over the verification and reinstatement is a separate matter in my mind. So for the NWP 12, you say you have jurisdiction on what? So the jurisdiction is only to review the verifications. I'm not maintaining that this court would have jurisdiction over a facial challenge to NWP 12. But what I'm saying is with regard to the verification, because that action was an application of a legislative rule, i.e. NWP 12, under the LEAF versus EPA decision out of the Eleventh Circuit, the appellate court has the jurisdiction to consider whether a legislative rule that's being applied was valid. And that's what the LEAF case stands for there. And so basically the ESA issue here, the way it comes up is that NWP 12 is in conflict and was beyond the court's authority because it conflicts with a substantive provision of the Endangered Species Act, namely the court's requirement to ensure that no species are jeopardized by its actions. And so for that reason, the legislative rule NWP 12 is invalid under the LEAF theory. So that's why we think we have jurisdiction as an applied challenge of a legislative rule. Let's assume you've got jurisdiction under NWP 12. How do you address the issue and the likelihood of success on the merits here with regard to that claim? With regard to the ESA? No, with regard to the NWP 12 claim. Okay. I'm sorry. So to clarify, Judge Wynn, do you want to hear about the likelihood of success on the failure to consult programmatically or on the modification to special condition A? Isn't that the NWP 12, the latter, the NWP 12, the modification? Okay. I thought that it was. I just wanted to be sure. Oh, you need to educate me. Don't you think you need to tell me what we're talking about. That's why I'm asking these questions, it seems to me. That's a major question. And I gave you the statement. If you get over the jurisdictional hurdle on it, then you're there in terms of going into core elements. And then the question is, with regard to that particular one, how do you address the likelihood of success portion of it? I will humbly try to educate you, Judge Wynn. I'm sorry that I needed that clarification. Look, on the likelihood of success there, special condition A, the requirement that MVP have an individual water quality certification, is a condition of the underlying permit there. It is a condition of NWP 12. That's what this court held. And that happened by operation of law. Just as the Clean Water Act in Section 401D is unambiguous that this condition had to be there, it's also unambiguous that it happened by operation of law. That is, the statute doesn't say a federal agency shall incorporate a condition. It says the condition shall be a condition. So, therefore, the division engineer has no authority here. And that's why it had to be done, if at all, by reissuing NWP 12. But let's assume that the division engineer had some authority here. The problem with the MVP and core argument is that they're insisting that West Virginia deserves special treatment when it wants the permit modified because it's 401 certification. But the problem is that's belied by the statute. Section 401D, because it has a one-year time period on a state's authority to certify, does not empower a state to modify a certification after the fact. And you don't have to take petitioner's word for what Section 401D means on that point. Is that because of the change that was made in September of this year? Did you say the state can't modify it, or could they do it before then? No, they couldn't do it before then. Yes, so the September action was EPA's repeal of the prior regulation. That action didn't change what the statute meant. It just finally reflected that EPA was acknowledging what the statute had meant all along, which is the compensation. Let me be clear, because you said you're going to educate me on this. I hope so. Let me be clear. So the prior regulation you're saying was wrong and right, and all they did with September was interpret the statute correctly. Is that right? That's correct. But under the prior regulation as it was, the prior regulation did allow the amendment for it to be changed. Is that correct? The prior regulation— Even if it's wrong, it allowed it, right? It purported to allow it, but only with the consent of the federal permitting authority. That is, it gave the Army Corps the authority to review that and then approve it or deny it in the course of its own modification regulations. So what I'm confused about is then you say, well, this September 11th just was true to the statute in terms of what the statute allows, but they did something pursuant to a regulation that said they could do it back in January. What says that that was wrong? Yes. But where is it said that the changing of the regulation in September was to correct a mistake in the previous regulation? If you look to the preamble of the EPA regulation, EPA says that Congress has precluded, that this Clean Water Act precludes a state from reconsidering or modifying a certification. So in EPA's view, it was correcting a mistake. And you don't have to take my word for it. Where do you see that EPA thinks they were correcting a mistake? And why not? Why don't you want to rely on the September 11th, 2020 change? I'm sorry. I think I do want to rely on the September. OK, because it sounded to me like in your colloquy with Judge Wynn that you didn't want to rely on that change because it was right all along before. They didn't need the change. It was right all along. Well, I am relying on it. But I'm saying that even if the prior regulation controls, we still prevail. It was still an error for the Army Corps to do what it did. OK. And can I also go back and try to make sure I understand the jurisdictional situation here? If we find that we don't have jurisdiction to review your claim that they improperly reissued NWP-12, do we nonetheless still possess jurisdiction to review the verification and reinstatement? Yes. OK, that's what I was talking about at the beginning when I said I see these as two separate jurisdictional issues. And at least I got all twisted up in your answers. Well, I apologize, Your Honor. It certainly wasn't my intent to twist anyone up in the answers. Let me take another run at it. The verification is flawed because in issuing the verification, the Army Corps relied on NWP-12, which itself was defective. And the Corps relied on the modification, which itself was defective. And under this court's authority in Dow AgroSciences and its progeny in Ergon, West Virginia, a 2018 case, this court can review whether an agency action was arbitrary and capricious for relying on prior agency action. I need to note something about our… Before you go, before you go, when you say it was defective, why are you saying it's defective? Well, NWP-12 itself is defective because it violates the ESA. And the modification was defective because the division engineer can't make NWP less stringent. That's why I say they're defective. Go ahead. Thank you, Your Honor. On the harm argument, I need to note or make a correction to Petitioner's reply brief in 20-2039. On page 19 of that brief, it asserts that the biological opinion concluded that trenching through streams would kill endangered candy darters. It turns out that Fish and Wildlife was talking about upland trenching. I just wanted to be clear. But Fish and Wildlife Service did conclude that stream bank denudation associated with stream crossings would kill candy darters. I'd just like to close by briefly observing on what should have happened here. MVP should have been directed under the core regulations to the individual permit process. That should have happened in 2017. It certainly should have happened after this court's last decision. In fact, if I recall the oral argument correctly, Judge Winn, you asked the court and MVP four or five times, why not just do an individual permit? I submit that the court never got a satisfactory answer to that question, and I don't know that we'll hear anything differently today. Thank you, Your Honors. Well, go ahead. Go ahead. It's fine. I can ask the others. All right. Thank you, Ms. Santini. Thank you. Mr. McCarty. Good morning, and may it please the court. This is Kevin McCarty on behalf of the court. With the court's permission, I'd like to start with the jurisdictional issue and, of course, start in a place we should always start in jurisdiction, and that is the statute that defines the extent of the court's jurisdiction. And that statute clearly limits its exclusive original jurisdiction to project-specific approvals issued in conjunction with a FERC certification or a natural gas facility. So there's no dispute that the verifications qualify under the plain language of the statute, but predicate agency actions, such as the Corps' reissuance of Nationwide 12 in 2017, do not fall within the scope of the statute. But didn't you argue the opposite in Montana with regard to NWP 12? No, we did not, Your Honor. The plaintiffs in their reply, the petitioners in their reply brief relied on two things in arguing that we supposedly took an inconsistent position on this issue, and we did not. The first is the Palm Beach case, a district court case. In that case, we argued that verifications, Nationwide 12 verifications for a FERC-certified natural gas facility had to be challenged in the court of appeals under the Natural Gas Act. The validity of the issuance of Nationwide 12 wasn't at issue, and so we had no occasion to say, nor did we suggest, that a claim challenging the reissuance of Nationwide 12 had to be brought in the court of appeals. And in our Ninth Circuit brief, we noted the unremarkable fact that pipelines subject to the Natural Gas Act that were referenced in the plaintiff's declarations had to be challenged in the court of appeals under the Natural Gas Act. At no point did we say that this court, in reviewing a verification, a project-specific verification, could review the validity of the court's factual no-effect determination back in 2017, or any other predicate action that might be relied upon or cited in the project-specific approval. Mr. McCarty, you're here, though. You can see, though, the verification would be. All you're saying is there, in the case there, Ninth Circuit, these other issues, the NWP-12, and whether or not the ESA is implicated here in terms of the consultation. But that gives us the jurisdiction. As you can see, this is agency action. As counsel said on the 717RD, this is agency action related to a gas pipeline. And the fact that there are other issues, subsidiary issues, or however you might call them, does that take away jurisdiction? Just because once the verification opens the door to jurisdiction, we can't look into what's the basis for the verification's defect? The court's jurisdiction is limited to the specific order that falls within the judicial review provision, and that's the verification. Now, there's an important point here that Mr. Cheney brought up that's not entirely accurate. He said that in the verifications, the court is relying on Nationwide 12 and the issuance of Nationwide 12. But let's look at the claim that he actually brought. He's using the verifications to get into this court, but he is not bringing an ESA claim against those verifications. The verifications rely for ESA compliance on the 300-page biological opinion being challenged in the other case. He's not alleging that the verifications violate the ESA, and we agree that he could make that allegation here. What he's doing is saying, thank you for letting me in the door. Now I'm going to challenge a factual no-effect finding that was made in 2017 when the court reissued Nationwide 12 wholly apart from this process relating to this pipeline. It had nothing to do with this pipeline, and the issuance of Nationwide 12 has independent significance far beyond this project. So I think under the National Association of Manufacturers case from the Supreme Court cited in our brief and also in the public citizen case, Congress has specified particular actions that are subject to immediate judicial review in the court of appeals, but relegated other actions for review to the district court, and there Congress's intent is clear. Congress's intent has to be honored, and you can't get around that by these other doctrines or based on any equitable considerations. Nevertheless, the other doctrines that the petitioners attempt to rely on don't apply. Dow involved this principle that when a court has exclusive jurisdiction to review an agency order, it has exclusive jurisdiction over all issues that appear in the controversy over that order. What that means, according to the Supreme Court's City of Tacoma decision, is that no matter what the basis is, no matter what your legal theory is as to why the reviewable order is invalid, it has to go to the court of appeals. But that doctrine has never been extended to grant the court exclusive jurisdiction over any predicate agency action that may be referenced in a reviewable order. If it did, I mean, that's essentially a boundless theory of jurisdiction. That would mean that when the court reviews the biological opinion, it could review all the listing decisions that are referenced in the opinion, or it could review the ESA regulations themselves, and that would totally undermine the entire purpose of this narrow judicial review provision, which is to provide for expedited review of project-specific approvals issued in conjunction with a FERC certification. Do you view a petition's challenge here to be against the verification and reinstatement, or is it more a challenge to the modification of the NWP-12's conditions? Well, they're using the verifications as a vehicle for mounting a collateral attack on two distinct agency actions that aren't directly reviewable in this court. The reissuance of NW-12 in 2017 and the court's January 2020 acceptance of West Virginia's amendments to its regional conditions on a nationwide permit. And as those two actions are not reviewable in this court under the plain language text or structure of the Natural Gas Act, they should go to district court, as they already are doing in the Northern Plains case. I don't think they're just arguing about the acceptance of it. They're really arguing what they seek is review of the verification and reinstatement as being arbitrary and capricious, not just the acceptance of the special condition. Well, Your Honor, I think the claim is that the verifications are arbitrary and capricious because the court violated the procedures and its regulations when it accepted the state's revised Clean Water Act. So they're not alleging any specific defect in the verifications. There's no dispute that this project meets state's amended regional conditions. But how can a state modify a special condition that was already made part of the NWP, given the change to the regulation on September 11, 2020, by the EPA? Thank you, Your Honor. That regulation was not in effect during the time. And I would like to add that this claim that the state exceeded its authority, this was raised in the petitioner's reply brief on the state motion, and should be disregarded on that basis alone, given the limited time we had to respond. So that should be disregarded. But beyond that, we look to the regulations in effect at the time. And at the time, those regulations clearly authorized the state of West Virginia to amend its certification. But the verification and reauthorization weren't issued until two weeks after the change in the regulation, right? Project-specific verifications, that's correct. But that has no bearing on the validity of the state's amendment of its certification back in January. And, in fact, EPA concurred in that amendment and approved it at that time, consistent with the regulations in effect at that time. Well, isn't that sort of a core issue here, what you're talking about, the fact that there was action taken after September 11? But your contention, as I understand it, is what was taken after was premised on something that was done lawful back in January. But from what I'm hearing from the other side is, you know, what happened in September of 2020 of this year is simply a faithfulness to the statute. That's what the statute said the whole time, that that regulation back in January didn't really authorize them to do it. I mean, couldn't do it because it wasn't under the statute. Well, under that formulation, it sounds like their reply brief on the stay motion asserted for the first time a challenge to a regulation in effect in January, which, again, we're going pretty far afield here if we're going to refute the validity of a regulation, EPA regulation, that was promulgated wholly apart from this project and had independent significance apart from this project. So so when you're talking about verification and reinstatement for purposes of jurisdiction, do you really have to go there? Because it seems like to me that is that could easily be addressed in when if you did assume jurisdiction, you didn't move to likelihood of success. Doesn't that document then reappear there in terms of whether they have a basis to do that? I apologize. I'm not sure I'm tracking and that's my fault. But would you mind reformulating the question? Essentially, essentially, if we move beyond the jurisdictional aspect of questions on NWP 12 and we go into the merits of what I mean, do you prevail there? Oh, yes. If we're looking at likelihood of success on the merits and how so? OK, on Nationwide 12, when the Corps reissued Nationwide 12, it explained that that nationwide permit had no effect on listed species because general under general condition 18. It does not authorize any projects that might affect a listed species, which is a more stringent standard that might occur in the vicinity of where listed species might be located or that occur in critical habitat. So since it doesn't authorize any projects that have an effect on listed species, it does not affect listed species. That's the essence of the Corps explanation of its no effect determination there. So even on that basis, the petitioners are unlikely to succeed on the merits. And again, even if even if they were, it doesn't follow that these verifications violate the ESA because they do not rely on the no effect determination for ESA compliance. And this is in Petitioners Exhibit 7, pages 19 through 23. They rely on the biop that the petitioners are challenging in the other case. So even if this court were to find that the no effect determination is inadequately supported, it would not follow that these verifications violate the Endangered Species Act. And for that reason, we're likely to go to plaintiffs. Petitioners are unlikely to succeed on the merits. Mr. McConnell, it seems like the Corps' position is that when you're looking at whether or not programmatic consultation is required, you said it might, but isn't it up to the permittee to determine whether it might have an adverse effect? The permittee is responsible for identifying if the project might have an effect. But the Corps makes the, and that's a more stringent standard than the may affect, as the Corps explained. But the Corps retains sole responsibility for making the ultimate no effect may affect determination and for carrying out any required ESA. The problem is that nothing is initiated until the permittee says it might. Well, even in the Northern Plains case, the court didn't dispute that there was no evidence that permittees were violating that requirement. And even if they did, there's considerable incentives for them not to violate it, because if they don't comply with that requirement, the project is not authorized under Nationwide 12. And if they happen to take listed species, they could be subject to civil and potentially criminal fines under both the Clean Water Act and the Endangered Species Act. And also, just as a general matter, in many instances, the project proponent is responsible for determining which laws are implicated by its project. The federal government doesn't assume that responsibility. Its responsibility is ultimately to make a determination as to whether its authorization meets the threshold for consultation. But it's appropriate to rely on the project proponent to provide the information necessary to make that determination. But the court doesn't have to accept West Virginia's change to Condition A, did it? The court's position is that it has limited discretion to review a state's amendment of its water quality certification to ensure it's consistent with the public interest. What statutory authority do you say it's limited? Well, under, I think it's Section 401 itself, which says that when a state comes up with regional conditions that it wants to apply to the nationwide permit, those quote-unquote shall become part of the permit. And also, this court- No, they shall be if they're accepted. And one of the big parts is in the conjunctive is public interest. You determine whether it's in the public interest. That's about as broad as you can get. It doesn't sound like what you were talking about, limited. Well, we have to take that, Your Honor, consistent with what this court said in the Sierra Club decision when we were litigating the prior verifications. The court said that we don't have any discretion to reject or modify the conditions adopted by the state. Now, we do. We do- No, no, no, no, no, no, no, no. We said it existed as a Condition A. You don't have the right to disregard it. But it's a different question if the state is changing it. As a matter of fact, making it less restrictive. You still, the core under the statute, you look at it, and one of the determinations is whether or not it's in the public interest. Why was it in the public interest to lower the standard, the 36-inch diameter pipe, to now, I guess, go on forever, I mean, in terms of size? How is that in the public interest, and what procedure did you use to make that determination? That's what the statute says. That's a part of it. Okay, thank you, Your Honor. I'm not sure if it says that in the statute, but we agree with you. We agree with you, and that's on me. I'm not positive about that. But we agree with you that the court has discretion to make a public interest determination. And the court did make a public interest determination that's explained in detail in the memorandum for the record supporting its ultimate decision. And I would point out that the petitioners are not challenging that determination. They are not saying that the state's amended certification is contrary to the public interest. So, you know, that's not in dispute in this litigation at this point. Their claim is the wrong person in the court approved or accepted, is the right word, accepted the state's amended certification. That's important. Is that not important? Well, from a substantive impact on the environment, it doesn't seem particularly compelling. But in any event, the court did file the proper procedures because the regulations specifically say that the division engineer is the individual authorized to review and accept the state's water quality certification. So we need not get into that point because the court complied with its regulations in this case. Do I have enough follow up questions? Yeah, you said you mentioned the division engineer, but the division engineer can only make state specific conditions regional. If they do so before the NWP is issued, not after or right in the middle of the whole thing. The regulation does say that does say before the state provides its original certification. But there is nothing in that stat in that regulation or in the preamble to Nationwide 12 that suggests that if the state modifies its certification down the road, suddenly everything changes and the division engineer's authority evaporates. And, you know, the court specifically addressed this in the preamble to Nationwide 12 when it said, look, regional conditions, including state's conditions included in the certification, they fall under the division engineer's responsibility and they do not require headquarters review. So there is no basis for assuming that just because the state amended its certification after it was initially prepared, that suddenly the division engineer's authority evaporates. Right, except for the fact that you agreed with me that the statute says that the division engineer has to do this before the process. Well, the regulation says, I'm sorry, I forget the exact wording, but I don't know if it says the division engineer has to do it before. It just says, you know, before. Look, I'm agreeing with you. It says if prior to the issuance or reissuance of such NWPs. Right, that's right. That's what it says. And I agree with you. It says, but it doesn't specifically prohibit the division engineer or even address who is responsible for approving unamended water quality certification. And since the division engineer has that inherent authority at the onset and nothing in the regulations indicates that someone else is vested with that authority, it was appropriate for him to exercise it. Thank you. Thank you, Your Honor. I see I'm well over the time. Thank you for your indulgence and for the reasons we stated here. And in the brief, the stay motion should be denied. Thank you, Mr. Carl. Mr. Sibley? May it please the court, George Sibley for Mountain Valley Pipeline. I'd like to start first with the questions relating to jurisdiction. I think here the court has struggled with the jurisdictional hook in this case, which is the issuance of the project-specific authorization, and then the actual merits arguments that are raised here, which concerns validity of predicate actions. Now, Mr. Taney's argument, he relies on getting into this court on the verifications itself, and then he asked the court to wall off consideration of what the district actually could do and actually did in these cases, in this case, in reviewing these predicate authorizations. With respect to the issuance of Nationwide 12, that was an action that occurred in 2017. And according to Mr. Taney's theory, that action itself, in and of itself, had effects on listed species that were reasonably certain to occur as of that moment. And at that moment, he has all of the ingredients, everything he needs, to raise in federal district court a challenge to that action. It is essential to the claim that the court ignore the project-specific consultation that occurred here, right? And that's the irony of this, because the jurisdictional hook, what gets him into this court for that claim, and for the division's amendment claim, for both of those claims, he asked the court to ignore what the district actually could do. Now, with respect to, and Judge Winn, this sort of gets to the question that you were raising earlier, concerning the effect of raising the verifications. The verifications only go to what the district was specifically authorized to do. And here, there's an implied, there's a suggestion in Mr. Taney's argument, that the district here has some discretion to disregard what the division has indicated are the terms of the permit. The district has no such discretion. Mr. Taney elsewhere notes that the district is bound by the chain of command, and so they certainly have no discretion to say, we're going to rely on a separate set of conditions, not the ones that the division has said are applicable. And with respect to Nationwide 12, certainly the district has no authority to go back and conduct programmatic consultation. And to Mr. McArdle's point, here, when we're focusing on the programmatic consultation argument, the district is not relying on that no effect determination. It's relying on the project-specific consultation, and that's a critical point. The lines of authority that the petitioner cite to overcome this jurisdictional hurdle, to allow the court to reach back and address these predicate authorizations that are not bound up in the district court's decision, neither of those lines of authority apply. With respect to the Leaf case out of the 11th Circuit, that case addresses a situation where it identifies two different, in the line of authority on which it relies, identifies two different ways that a party can go back and address predicate questions, such as the statutory authorization of an agency to issue a set of regulations. And there's one circumstance where the agency has exceeded its parent authorization, its enabling authorization. Well, there's no accusation here that the court lacked authority to issue Nationwide 12. In the second circumstance, it concerns, again, in the Leaf case, where a party has petitioned for rulemaking that would change the underlying rule, and that rulemaking has been denied. And even in that circumstance, the review is limited to substantive challenges. It does not cover procedural challenges. And as we've discussed in our papers, both of these arguments would qualify as procedural. In the reply brief, for the first time, petitioners invoked this court's decision in Dow AgroSciences, and that case supports our position and refutes the petitioner's position. The whole thing in Dow AgroSciences is that the predicate act, the issuance of the biological opinion relating to the pesticide registrations there, did not inhere in the controversy over the actual registration decisions themselves, would not inhere in that controversy. And the court there makes a very important point that's directly applicable here. They note that in that second case, which is analogous to this court's review of the verifications here, the court's review is limited to the agency's reliance on the underlying decision, not the underlying decision itself. And here, unlike perhaps in that case, the district's discretion is sharply limited. Again, that's a premise on which Mr. Keeney's claim rests about the LRD modification. So we think it's quite clear that as to both of these actions, the court lacks jurisdiction. In the question that they're saying your reliance is directly related to the predicate question, that is that you never had a programmatic consultation, looked at this broader and therefore infected your required cumulative impact analysis. And so if verification, as you call it, the hook that gets you there, what good would that be to have direct circuit review for verification if you can't look at the things, as you said, that undermines your reliance on it for your verification? It's not whether you did a good job at the programmatic consultation. You did no job. You didn't do it. Well, your honor, respectfully, the court concluded that that act itself would have no effect in the programmatic consultation obligation. Any consultation argument does not arise in the face of a no effect determination. What petitioners ask this court to do, what they must ask this court to do, is find that that action, that conclusion was arbitrary and capricious. Not the verification here, as a first step, as a necessary first step. And indeed, as the only step, they must have you look at the court record before the court in 2017 and find that that action was arbitrary and capricious. And that's the problem. They are asking the court not to assume the validity of those actions and look at the court's decision to rely on them, but instead to assess the validity in the first instance. And that is the jurisdictional problem. And that's what the cases we cite in our papers, in particular, the public citizen versus National Highway Traffic Safety Administration clearly forbids. That would be an expansion of the court's jurisdiction beyond what what Congress has has indicated. If I could turn, please, to the modification of the. A district court do that now address those issues that you said that we cannot. They would petitioners would appear to be able to raise that claim in federal district court. My only my only reason for for not conceding that unequivocally is I haven't seen the complaint that that might be produced in that case. And I don't want to concede that in the first instance. But I have no doubt that a lawyer of Mr. Cheney's capability would be able to articulate a complaint. District court that would clear the article three disability hurdles. Yeah, I have a question about your irreparable harm argument. What about opposing counsel's argument that the excess cost and resources and all that is of respondents and making? Because they could have gotten an individual permit years ago, as this court suggested in twenty eighteen. Well, certainly this court did not have jurisdiction in twenty eighteen to decide the advisory issue, an advisory opinion about. Right. And I'm saying I'm not saying that we issued an advisory opinion or told you to do that. I'm just clearly it was questioned back in Sierra Club and during oral argument as opposing counsel indicated, at which point, at least in response to some of Judge Wynn's questions, respondents indicated that if they'd started out with an individual permit process at the beginning, it would likely be done by now. So now the question is, how is not doing the individual permit process and suffering all the extra cost, not harm of respondents own making? Well, Your Honor, because we qualify for nationwide permit. Well, it's the simple answer that Congress specifically created general permits. I see I'm over my time. If I may. Thank you, Mark. The Congress specifically created a category of general permits to ease the regulatory burden. And by the time soon after the court's decision, it became apparent that the condition would be modified. Now, as the court knows, we soon dealt with we had to deal with other issues relating to to ESA compliance. And if you could, if if you could do all that you say that you're doing now, if the regulations and everything were appropriate are appropriate for you to do what you're doing now, then why in the August 4th, 2020 earnings call did MVP say that it intended to trench through critical streams, quote, as quickly as possible before anything is challenged? Because it was a recognition, Your Honor, that our opponents are implacable. We would be challenged that our opponents are implacable, that they will challenge anything that we do. And in this context, we have been in a temporary stabilized condition for a year, incurring a cost of 20 million dollars per month. We have the authorizations. We are not going to wait to get sued and wait for those lawsuits to be resolved. It is directly in line with the positions that we are taking here. We incur a cost of 20 million dollars a month to maintain temporary erosion control devices. That's a fact. And and this Monday morning quarterbacking about what we might have done a long time ago is besides the point. As this score, everything that we have done to get the project to where it is right now was done lawfully. They have challenges to the authorizations, but we haven't been going out operating in contravention of this court's orders. Everything we have done has been in accordance with FERC orders and in accordance with. And to be clear, I'm I'm I didn't mean to imply that you were doing anything in contravene and contravention of the court orders. Well, thank you, Your Honor. And I see that I, too, am well over my time. I'm happy to answer any further questions the panel has. All right. So just in case I think we're about to wrap up something and we did pepper you a bit at the end. Would you like to have 60 seconds or so to close your thought? I did. One thing I did want to raise and thank you, Your Honor, for allowing me the opportunity to do this. There's been some discussion of the September 2020 revision to or not revision, but that the EPA's rule governing a section 401. It is an overstatement to say that that rule prohibits modifications. It specifically allows for acknowledges that licensing agencies like the court can allow that in circumstances where there has been an intervening judicial decision or a change in state law. And both of those conditions are satisfied here. This court in its decision issued a decision about what the prior certification meant. That was at odds with what West Virginia thought its conditions meant. And then the change in law was the need for the individual certification was largely became duplicative with the state's promulgation of its oil and gas stormwater permitting regulation. That can specifically be found. Give me one moment. It's on the preceding page. It's at 85 Fed Reg 42 279. And it appears the top of the third column in that in that in that discussion, third or fourth column, I believe, in that in that in that discussion. So what we have here is a modification that's occurring exactly in the circumstance where it would be appropriate under the new rule. I've I've taken more than 30 seconds, your honor. I apologize. Thank you, Mr. Sibley. Thank you, Chief Judge Gregory. Look, if petitioners had gone to the district court there in the Huntington division right next to the court's district office and appeared in front of Judge Chambers with a complaint challenging NWP 12 in one hand and a standing declaration referring to the MVP in the other. We would have been met by a motion to dismiss for lack of jurisdiction and for rightness and told to come here. This is a ploy on the part of the court to try and further delay resolution of this action. And there is a principle that that appellate courts apply. And it was recognized by this court in the Palumbo versus waste technologies case that when there is any ambiguity or whether it's unclear whether appellate jurisdiction or district court jurisdiction should apply. It should be resolved in favor of appellate court jurisdiction. And that's because otherwise you end up with duplicative litigation. And considering that Congress intent with 717 RD was to streamline review of natural gas permitting decisions, it's perfectly appropriate for this court to consider those actions. The other thing on jurisdiction I point out is that the statute itself, 717 RD, doesn't just apply to the issuance or denial of permits for these facilities. It also applies to agency actions that, quote, condition such permits. And that would include, of course, the Corps' modification decision. So I would suggest that this court, under the language of 717 RD, would have jurisdiction to consider the conditioning of NWP 12. Okay, beyond jurisdiction, on the merits, since you did not raise the September 11th, 2020 change to the regulation until your reply brief, if we didn't consider that argument, what is your best argument on the verification and reinstatement challenge? The best argument there is that, nonetheless, notwithstanding that rule change, that the Corps' regulations still prohibit it from making an NWP less stringent. The division engineer simply lacks that sort of discretion, and so it's that one-way ratchet argument, right? They simply couldn't do this. So you go back to the argument, then, that the division engineer only has authority prior to the issuance or reissuance. That's absolutely right. That's your fallback argument. And that regulation, 330.4C, just reflects the status of the statute that states can't modify after the fact. And the reason that we raised it in reply, I don't think this is an impermissible assertion of a new argument. It is directly responsive to the position that the Corps and NWP took, that because West Virginia had done this, the Corps had no discretion. They said that in their briefs, and they relied on Section 330.4C, too. But if you look at the Corps documents, the record for decision, the division engineer never relied on that. So you weren't raising a new argument. Your argument goes you weren't raising a new argument. You were merely responding to the arguments raised by respondents. That's absolutely correct. We didn't think 330.4C was on the table because the division engineer never cited it. And so we proceeded with what we thought was our best argument at that time when they raised that. And they insisted that because West Virginia had done this, they had little to no discretion. Well, then it became at issue in this case. I'd also like to address the Dow. Jumping back to jurisdiction really quickly, my last point there is that really the points that MVP was making on Dow AgroScience are distinguishable. The result in Dow AgroScience came about because that challenge involved the actions of two different agencies. In that case, it involved a decision by EPA and a decision by one of the wildlife services. Here, it's the Corps all the way down. So it's much different than it was in Dow. Also in Dow, the second action, EPA's action over which the appellate court would have had jurisdiction, had not yet occurred. As we stand here, everything has occurred that is needed for appellate court jurisdiction. So I would suggest that the result in Dow is distinguishable. I see that I'm nearly out of time. My final point on whether a state can modify. You don't need to take petitioner's word for it. You don't even have to take EPA's word for it. This question was decided by the Western District of Washington in the airport communities case. And in that case, the court there held that Section 401 only obligates the Corps to incorporate conditions that were put out before that one-year deadline. I see I'm out of time, if I may briefly conclude. You may. The citation to that case is 280F2D1207. It's one more grain of sand that suggests that the Corps simply didn't have the authority to do this. And therefore, its effort to do so was void ad obitio under this court's decision in Smithfield. Unless the court has any further questions, we appreciate the opportunity to present these arguments. Thank you. Thank you. Thank you, counsel. With regret, I have to say that we cannot follow our normal tradition in the Fourth Circuit to come down and greet you and shake your hand in this virtual environment. But please know that nonetheless that our respect and gratitude for your presentation today is just as fulsome. And we wish you all to be safe and stay well. And with that, I'll ask the clerk to adjourn the court. Senator. This honorable court stands adjourned. Senator. That's the United States and its honorable court.
judges: Roger L. Gregory, James A. Wynn Jr., Stephanie D. Thacker